*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

TODD MICHAEL LINNARTZ,

Defendant-Appellant.

UNPUBLISHED
October 22, 2020

No. 348297
Shiawassee Circuit Court
LC No. 2018-002914-FH

Before: STEPHENS, P.J., and SAWYER and BECKERING, JJ.

PER CURIAM.

A jury convicted defendant, Todd Michael Linnartz, of manufacturing methamphetamine (meth), MCL 333.7401(2)(b)(*i*); operating or maintaining a meth laboratory, MCL 333.7401c; tampering with evidence, MCL 750.483a(6)(b); obtaining pseudoephedrine to make meth, MCL 333.17766c(1)(d); assault with a dangerous weapon, MCL 750.82; and assaulting, resisting, or obstructing a police officer (resisting arrest), MCL 750.81d(1). The trial court sentenced defendant to 280 to 480 months' imprisonment for maintaining a meth lab, second or subsequent offense, MCL 333.7413(1), and to a consecutive term of 280 to 480 months' imprisonment for manufacturing meth,[1] second offense, MCL 333.7413(1). The court also sentenced defendant as a third-habitual offender, MCL 769.11, to concurrent sentences of 85 to 240 months' imprisonment for tampering with evidence, 24 to 120 months' imprisonment for obtaining pseudoephedrine to make meth, 24 to 96 months' imprisonment for assault with a dangerous weapon, and 24 to 48 months' imprisonment for resisting arrest. Defendant appeals his convictions by right. We affirm.

## I. RELEVANT FACTS

On June 21, 2018, five officers from the Mid-Michigan Area Group Narcotics Enforcement Team (MAGNET), along with other uniformed law enforcement officers, executed a search warrant at defendant's home based on a report that defendant was distributing meth. Officers

---

[1] The court exercised its discretion to sentence defendant to consecutive sentences pursuant to MCL 333.7401(3).

announced themselves as law enforcement, stated that they had a search warrant, and ordered defendant to exit the house. Defendant refused and demanded to review the search warrant. The MAGNET team breached defendant's front door and saw defendant standing toward the back of the residence holding his 80-pound pit bull dog by the collar. Officers stated that the dog was barking and aggressive, and multiple officers testified that they believed the dog was going to bite them. At one point, defendant told the dog, "You want 'em, go get 'em," and released the dog, which charged toward the officers. Officers retreated outside and lost contact with defendant for approximately 5 to 10 minutes before defendant voluntarily exited the house. The dog followed defendant outside and appeared to be friendly. The officers conducted a search of the home and discovered several items that suggested defendant was producing meth, including suspected one-pot reaction vessels in the kitchen sink that appeared to have been recently washed out. Officers found several household items that are commonly used to produce and smoke meth, as well as two plastic vials that contained residue that tested positive for meth.

## II. ANALYSIS

### A. NPLEX RECORDS

On appeal, defendant first argues that the trial court erred by admitting into evidence National Precursor Log Exchange (NPLEx) records. NPLEx is a nationwide database that tracks purchases of products containing pseudoephedrine. The database is administered by a private company, and the information is obtained by pharmacies at the time of purchase. Defendant contends that the trial court erred in admitting the records because they constituted hearsay without exception and their admission violated his rights under the Confrontation Clause, US Const, Am VI; Const 1963, art 1, § 20. We disagree.

We review for an abuse of discretion a trial court's decision to admit evidence. *People v Lukity,* 460 Mich 484, 488; 596 NW2d 607 (1999). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Grant*, 329 Mich App 626, 634; 944 NW2d 172 (2019) (quotation marks and citation omitted). Defendant did not object to admission of the records on constitutional grounds in the trial court; therefore, this issue is unpreserved, and our review is for plain error affecting substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The defendant bears the burden to demonstrate that an error occurred, that the error was clear or obvious, and that the error affected his or her substantial rights. *Id.* In order to establish the last element, the defendant must show that the error "affected the outcome of the lower court proceedings." *Id.*

### 1. CONFRONTATION CLAUSE

The basis of defendant's claim of constitutional error is his assertion that the NPLEx records were inadmissible because they were testimonial statements. "The Confrontation Clause of the Sixth Amendment bars the admission of 'testimonial' statements of a witness who did not appear at trial, unless the witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness." *People v Walker (On Remand)*, 273 Mich App 56, 60-61; 728 NW2d 902 (2006). "A statement is testimonial if the declarant should reasonably have expected that [the] statement would be used in a prosecutorial manner and an objective witness would believe that the statement would be available for use at a later trial." *People v Clark*, ___

Mich App \_\_\_; \_\_\_ NW2d \_\_\_ (2019) (Docket No. 343607); slip op at 19. In other words, a statement is testimonial and subject to the Confrontation Clause if it was "prepared specifically for use at . . . trial." *Melendez-Diaz v Massachusetts*, 557 US 305, 324; 129 S Ct 2527; 174 L Ed 2d 314 (2009), and had "the primary purpose of accusing a targeted individual of engaging in criminal conduct." *Williams v Illinois*, 567 US 50, 84; 132 S Ct 2221; 183 L Ed 2d 89 (2012). Defendant argues in his appellate brief that the NPLEx records "are testimonial because the pharmacists or any reasonable person could assume that the records would be used at a later trial should there be a violation of the allowed amount of purchases."

That NPLEx records *could* be used *should* a violation occur is insufficient to show that the records are "prepared specifically for use at . . . trial, *Melendez-Diaz*, 557 US at 324; 129 S Ct 2527, 2540, and with "the primary purpose" of targeting one accused of criminal conduct, *Williams*, 567 US at 84, 132 S Ct 2221, 2243. Detective Trooper Ryan Dunlap testified that Michigan law requires pharmacies to scan the ID of anyone who purchases pseudoephedrine, and that the log is created to show identifying information, including how many grams were purchased, where, when, and by whom. The police have the ability to retrieve the logs but cannot manipulate them in any way.

As support for his argument, defendant relies on three cases where courts have determined that a document prepared by a nontestifying expert violated the Confrontation Clause. In *Bullcoming v New Mexico*, 564 US 647, 663-664; 131 S Ct 2705, 180 L Ed 2d 610 (2011), the United States Supreme Court determined that the admission of a blood-alcohol analysis report violated the Confrontation Clause because it was generated after police sent the defendant's blood sample to a state laboratory to assist in the police investigation. Similarly, in *Melendez-Diaz*, 557 US at 308, the Court held that a forensic lab report regarding seized plastic bags that were analyzed on police request was a testimonial document that violated the Confrontation Clause. Finally, in *People v Fackelman*, 489 Mich 515, 532-533; 802 NW2d 552 (2011), cert den 565 US 1059 (2011), the Michigan Supreme Court determined that a forensic psychiatric report was testimonial evidence because, among other things, it focused on the defendant's alleged crime and pending charges and the defendant's admittance to the hospital was arranged by lawyers.

Defendant's reliance on these cases is misplaced. The reports at issue in *Bullcoming, Melendez-Diaz*, and *Fackelman* were each generated after a defendant was charged with a crime and pursuant to a police investigation or a request by lawyers. By contrast, the data compilation and reporting procedures Detective Trooper Dunlap described are required for every purchase of pseudoephedrine products within the state and regardless of whether the log is ever used for litigation. Unlike the reports at issue in *Bullcoming*, *Melendez-Diaz*, and *Fackelman*, the NPLEx purchase logs responded to state mandates, were being kept before defendant was suspected and accused of the instant crimes, and recorded any purchase of pseudoephedrine, not just those made by defendant. The possibility that the NPLEx records could be used as evidence against a defendant in criminal prosecution does not mean that they were specifically or primarily prepared for such use. Accordingly, the NPLEx records were not testimonial and their admission did not violate the Confrontation Clause. Defendant has not established a plain error. See *Carines*, 640 Mich at 763.

## 2. BUSINESS-RECORDS EXCEPTION

Defendant next contends that that the NPLEx records are hearsay, and the trial court erred in admitting them under the business-records exception, MRE 803(6), because the exception was inapplicable, given "the motivation for the data collection," and because the witness through whose testimony the prosecution introduced the records, Detective Trooper Dunlap, neither created the records nor was he their custodian. Defendant's arguments are unpersuasive.

Out-of-court statements offered to prove the truth of the matter asserted is hearsay, MRE 801(c), and hearsay is inadmissible unless it falls under one of the exceptions provided by the Michigan rules of evidence, MRE 802. The business-records exception, MRE 803(6), excludes the following from operation of the hearsay rule:

> A memorandum, report, record, or data compilation, in any form, of acts, transactions, occurrences, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian *or other qualified witness*, or by certification that complies with a rule promulgated by the supreme court or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit. [Emphasis added.]

As pertains to the case at bar, MRE 803(6) allows admission of a record or data compilation of transactions, made at or near the time by a person with knowledge, if the record or data collection is kept in the "course of a regularly conducted business activity," and if the business regularly kept such record or data collection. The foundation for admitting such documents may be provided by the custodian or other qualified witness, or by a certificate that complies with the court rule.

In contending that the "motivation for the data collection" makes the business-records exception inapplicable, defendant is essentially reasserting his argument that the NPLEx log is testimonial because it was created, as defendant insists, "in anticipation of potential criminal litigation." We have already rejected this argument and need not address it further.

As to who may properly lay the foundation for admission of evidence under the business-records exception, MRE 803(6) allows qualifying records to be introduced through the testimony of "the custodian or other qualified witness." Addressing FRE 803(6),[2] the federal counterpart to MRE 803(6), the Sixth Circuit Court of Appeals has explained that "[another] qualified witness should be given the broadest interpretation," and that "[t]he foundation for admitting evidence under Rule 803(6) may be laid, in whole or in part, by the testimony of a government agent or

---

[2] FRE 803(6) is not identical to that of MRE 803(6), but the differences in language are not relevant to the instant analysis.

other person outside the organization whose records are sought to be admitted. The only requirement is that the witness be familiar with the record keeping system." *United States v Collins,* 799 F3d 554, 584 (CA 6, 2015); see also *People v VanderVliet*, 444 Mich 52, 60 n 7; 508 NW2d 114 (1993), amended 445 Mich 1205; 520 NW2d 338 (1994) (indicating that, because Michigan's rules of evidence are based on the federal rules of evidence, courts may find case law referring to a parallel federal rule helpful and persuasive).

Here, Detective Trooper Dunlap testified that he had personal knowledge and expertise regarding how and why the logs were created and maintained and had been trained in how to use them. Based on the trooper's testimony, the trial court made a factual finding that he was an "other qualified witness" for purposes of MRE 803(6). Defendant does not challenge that finding. To the extent defendant argues that Detective Trooper Dunlap was not a proper witness to introduce the records because he did not create them, MRE 803(6) does not require the witness introducing the records to have created them, only that the records themselves were made by, or with information from, a person with knowledge. Defendant does not argue that the records were not made by a person with knowledge or with information conveyed by such a person. The trial court having found Detective Trooper Dunlap a "qualified witness" for purposes of MRE 803(6), a finding that defendant does not challenge, and absent any requirement that the "qualified witness" created the records or is their custodian, we conclude that the trial court's admission of the NPLEx records into evidence was not an abuse of discretion. See *Lukity,* 460 Mich at 488.

## B. SUFFICIENT EVIDENCE

Defendant next argues that the prosecutor did not present sufficient evidence for a reasonable jury to have found that the elements of assault with a dangerous weapon were proven beyond a reasonable doubt. Specifically, defendant argues that the officers could not have "reasonably" feared his dog because the dog "never made physical contact with anyone present"; acted "confused" during the ordeal, according to one witness; was friendly and easy to put on a leash five to ten minutes later; and was never close enough to harm the officers. We disagree.

We review de novo challenges to the sufficiency of evidence. *People v Cox*, 268 Mich App 440, 443; 709 NW2d 152 (2005). We "view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).

The elements of assault with a dangerous weapon are "(1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure or place the victim in reasonable apprehension of an immediate battery." *People v Bosca*, 310 Mich App 1, 20; 871 NW2d 307 (2015) (quotation marks and citation omitted). "Assault" is defined as "either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Meissner*, 294 Mich App 438, 454; 812 NW2d 37 (2011) (quotation marks and citation omitted).

The prosecution presented ample evidence to establish that the officers were "in reasonable apprehension of receiving an immediate battery." Detective Matthew Fray testified that when officers initially breached the house, defendant's dog was barking and "appeared to be trying to get away from [defendant] to come toward the door." He testified that his "gut feeling was that

the dog was trying to come and attack us as to defend the home." Lieutenant Michelle Taylor also testified that the dog was barking and "aggressive," and it would only advance a few feet before returning to defendant. Defendant admitted that he commanded his dog to attack the officers. Detective Fray testified that the dog was released and advanced toward the officers, who were "stacked up" at the front door, and Detective Trooper Dunlap expressly testified that he was afraid the dog was going to try and bite them. Detective Fray testified that he believed the dog could have injured them and that defendant intended for the dog to do so. That the dog did not make physical contact is legally irrelevant. See e.g., *People v Carlson*, 160 Mich 426, 429; 125 NW 361 (1910) ("That an assault may be committed without actually touching the person of the one assaulted is not disputed, and no authorities are required in support of the proposition."). Viewing this evidence in the light most favorable to the prosecutor, *Wolfe*, 440 Mich at 515, we conclude that the evidence was sufficient for a reasonable jury to find that the element of "reasonable apprehension" had been met. That the dog was friendly and easy to put on a leash after the incident does not negate the reasonableness of the officer's fear during the incident. And, to the extent that an officer's testimony that the dog appeared "confused" contradicts testimony about its aggressiveness, we resolve conflicts in the evidence in favor of the prosecution. *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008) (indicating that, when reviewing a claim of insufficient evidence, "[a]ll conflicts in the evidence must be resolved in favor of the prosecution").

## C. EXTRANEOUS INFLUENCE

Defendant next argues that he is entitled to a new trial because the jury was exposed to an extraneous influence in the form of knowledge that he was incarcerated, and that his trial counsel rendered ineffective assistance by failing to move for a mistrial. Once again, we disagree.

Defendant concedes that he did not preserve for appellate review the issue of the jury's exposure to an extraneous influence. We review unpreserved errors for plain error affecting substantial rights. *Carines*, 60 Mich at 763. Defendant preserved his claim of ineffective assistance of counsel by filing in this Court a motion for remand for a *Ginther* hearing.[3] Because this Court denied defendant's motion to remand for a *Ginther* hearing,[4] our review is limited to mistakes apparent from the record. *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008).

A criminal defendant is entitled to be tried by a fair and impartial jury. *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). "Where the jury considers extraneous facts not introduced in evidence, this deprives a defendant of his rights of confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment." *Id*. The Michigan Supreme Court has laid out a two-part test to determine whether a jury was exposed to extrinsic influences that requires reversal:

First, the defendant must prove that the jury was exposed to extraneous influences. Second, the defendant must establish that these extraneous influences created a real

---

[3] *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973).

[4] *People v Linnartz*, unpublished order of the Court of Appeals, issued October 21, 2019 (Docket No. 348297).

and substantial possibility that they could have affected the jury's verdict. Generally, in proving this second point, the defendant will demonstrate that the extraneous influence is substantially related to a material aspect of the case and that there is a direct connection between the extrinsic material and the adverse verdict. If the defendant establishes this initial burden, the burden shifts to the people to demonstrate that the error was harmless beyond a reasonable doubt. [*Id.* at 88-89 (citations omitted).]

During his testimony, defendant explained his purchases of pseudoephedrine by asserting that he used it to control his allergies. At the close of his testimony, one juror submitted the question, "What is being used to control [defendant]'s allergies in jail?" A second juror submitted the question, "What are you currently using to manage your allergies since June 21, 2018?" Addressing these questions outside the presence of the jury, the trial court said to counsel:

And I think the record should reflect that this Court and Security has done everything in its power to prevent the jury from knowing the status of [defendant] and his incarceration pending trial.

He's been brought in well before seven o'clock in the morning, taken out well after five o'clock. He is in the courtroom, and has been in the courtroom in civilian, appropriate attire. He was given a haircut. He was given a shave. He is not in shackles, and he's not restrained in any way in the courtroom.

I think this Court, and its staff has gone above and beyond the call of duty not to give the impression that [defendant] is incarcerated.

The prosecutor agreed that there was nothing the court could have done differently because incarceration had never been brought up during the course of trial and posited that the juror likely was assuming that criminal defendants are routinely lodged in jail while awaiting, and during, trial. Defense counsel also stated that he had not "seen anything the Court has done or could have done differently that would have prevented anyone from knowing that [defendant] is incarcerated." The trial court decided that it would not read either question because their prejudicial effect would outweigh the probative value, and noted that "the jury knowing that the defendant is incarcerated is not necessarily going to be an automatic mistrial."

Assuming that defendant's incarceration is an "extraneous influence," defendant has proved neither prong of the *Budzyn* test. The record gives us no reason to believe that the jurors based their questions on actual external information. We agree with the prosecutor that the questions appear to assume that defendants are housed in jail from their arrest through their trial. In addition, there is no indication that any of the other jurors were exposed to this information because the court refused to read the question to the jury. Thus, defendant has not "prove[d] that the jury was exposed to extraneous influences." *Budzyn*, 456 Mich at 88.

Even if we assume for the sake of argument that defendant has established the first prong of the *Budzyn* test, he has not established that the alleged extraneous influence "created a real and substantial possibility that they could have affected the jury's verdict." *Id*. at 89. Defendant argues that the evidence of his guilt was not overwhelming and that, but for the jury's improper exposure

to the knowledge of his incarceration, the jury may have acquitted him. However, our review of the record compels us to conclude that the prosecution presented ample evidence that, if believed by the jury, established defendant's guilt. Multiple officers testified that, when they searched defendant's property according to the search warrant, they found nearly all of the ingredients needed to cook meth, paraphernalia needed to cook meth, and capsules that tested positive for meth. Officers also testified that defendant appeared to be trying to dispose of incriminating evidence, and multiple witnesses testified to defendant's conduct that constituted assault and resisting and obstructing a police officer. Although defendant's credibility was at issue during his testimony, this case did not turn entirely on which witnesses the jury found more credible; the prosecution presented ample physical evidence of defendant's guilt. Thus, even if the jury was exposed to extraneous information regarding defendant's incarceration, there was no real and substantial possibility that it affected the jury's verdict.

Defendant contends that his trial counsel rendered constitutionally ineffective assistance by failing to move for a mistrial based on the questions of the jurors. Ineffective-assistance claims are mixed questions of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). To prevail on a claim of ineffective assistance, a defendant must prove: (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and, (2) that there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. See *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). On the record before us, there is no evidence that counsel performed below an objective standard of reasonableness when he failed to move for a mistrial when there was no basis for such motion. Counsel does not render ineffective assistance for failing to advance a meritless position. *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010). Having failed to establish the first of two prongs required to prevail on a claim of ineffective assistance, defendant's claim necessarily fails.

## D. JURY INSTRUCTION

Defendant next contends that the trial court invaded the factfinding province of the jury, negated the presumption of innocence, and shifted the prosecution's burden of proof, when it instructed the jury that witnesses, including police officers, cannot lie while testifying, and that defense counsel was ineffective for failing to object to the comment. Both arguments fail.

Defendant failed to object to the comment he now challenges on appeal, so the issue is unpreserved, and our review is for plain error affecting substantial rights. *Carines*, 460 Mich at 763. Defendant's preserved ineffective-assistance claim is, again, reviewed de novo, *LeBlanc*, 465 Mich at 579, based on mistakes apparent from the record, see *Horn*, 279 Mich App at 38.

A criminal defendant has a right to a properly instructed jury. *People v Lambert*, 395 Mich 296, 304; 235 NW2d 338 (1975). We consider jury instructions as a whole to determine whether the court misinformed the jury or otherwise committed an error, *People v Hartuniewicz*, 294 Mich App 237, 242; 816 NW2d 442 (2011), and will affirm a conviction when the instructions fairly presented the issues to be tried and adequately protected the defendant's rights, see *People v Kowalksi,* 489 Mich 488, 502; 803 NW2d 300 (2011).

During voir dire, defense counsel asked prospective jurors hypothetical questions regarding a citizen's obligation when presented with a warrant and whether police have an obligation to be truthful when doing their job. One juror indicated that he thought police officers have an obligation to be truthful at all times. The court called a bench conference, after which the juror asked for clarification. After a second bench conference, the court explained that undercover police officers "can use some subterfuge when doing their jobs, but they can't when recounting what happened. Right -- or stating the nature of what's happened, facts." When the juror continued to express confusion regarding whether an officer could lie about having a warrant and not be held accountable for the lie, the court again attempted to clarify:

> *The Court*: -- you're going to have to listen to all the testimony, and, then, you're going to have to decide what happened.

> *Juror*: Okay.

> *The Court*: Do you understand? You'll have to hear the testimony and listen to the instructions, and, then, decide what happened. That's your job as a juror is to decide the facts, and there will be law to instruct you on that.

> *Juror*: So, I would take the officer at his word. Do you know what I mean? And expect that he's held under a different set of guidelines that say what he's supposed to be saying.

> *The Court*: Well, no -- I mean, an officer's testimony is to be judged the same as anybody else's testimony as to whether or not they're credible and telling the truth. Do you understand that?

The juror explained that he was asking whether someone must take an officer at his word if the officer shows up at his house and claims to have a warrant. After holding another bench conference, the court explained that officers are not required to show a warrant right away, but must provide the warrant to the person to be searched at some point later. A second juror then requested further clarification:

> *Second Juror*: I just want to clarify something.
>
> You said that if an undercover officer is going to purchase drugs and the guy said it was [sic], asked him if he was a cop, you said it's okay for him to say no.

> *The Court*: That is okay.

> *Second Juror*: Okay. But, he—but, when he goes to court, he has to then say he said it was [sic], said no?

> *The Court*: Yeah.

> *Second Juror*: Okay.

*The Court*:  And, well, an officer, or any witness, can't put their right hand up and tell a lie.  They can't do that—I mean, they've got to tell the truth.

*Second Juror*:  But, the police can lie, at that point, on the street.

*The Court*:  On the street to, in the course of police work, you know, as long as their misrepresentation doesn't violate the constitution.

*Second Juror*:  Okay.

*The Court*:  All right.  [Emphasis added.]

Defendant challenges the comment italicized above, contending that the court's statement was effectively an instruction to the jury that police officers and witnesses cannot lie while testifying in court.  Viewed in context, however, the court was not instructing the jury that it should presume that all witnesses tell the truth on the stand.  Rather, the comment occurred in the larger context of a discussion about the rights and responsibilities of a citizen for whose property police claim to have a search warrant.  More specifically, it occurred during a tangential exchange regarding whether and when an officer may use trickery.  That witnesses are expected to tell the truth when testifying should come as no surprise; before each witness took the stand, including defendant, the court asked whether the witness would "tell the truth, the whole truth, and nothing but the truth, so help you God."[5]  That witnesses may not tell the truth was reiterated by the trial court's repeated instructions to the jury that one of its roles was to determine the credibility of witnesses.

Even in the immediate context of the challenged statement, the court stressed that it was the jury's obligation to listen to and weigh witnesses' testimony and determine whom to believe.  Further, before and after the presentation of proofs, the court properly instructed the jury that defendant's innocence was presumed, that the prosecutor had to prove each element of each charge beyond a reasonable doubt, and that the jury's role was to decide the facts, which included determining what testimony to believe and what to reject.  The court also instructed the jury that it could only consider evidence that had been properly admitted, that the court's "comments, rulings, questions, and instructions" were not evidence, and that the jury was the judge of the facts and "should decide the case from the evidence."  "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors."  *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003).

In light of the foregoing, we find no plain error affecting defendant's substantial rights.  See *Carines*, 460 Mich at 763.  Viewed as a whole, *Hartuniewicz*, 294 Mich App at 242, the court's instructions fairly presented the issues to be tried and adequately protected defendant's rights, *Kowalksi,* 489 Mich at 502.  Because the trial court's statement was not erroneous and did not

---

[5] The only exception was the first witness, whom the court asked, "Do you promise that you will tell [sic] testify truthfully, so help you, God?"

interfere with the jury's ability to impartially judge each witness's credibility, defense counsel was not ineffective for failing to raise a futile motion for a mistrial. *Ericksen*, 288 Mich App at 201.

We conclude that the trial court did not abuse its discretion or violate defendant's rights under the Confrontation Clause by admitting the NPLEx records into evidence, and that the prosecution presented sufficient evidence from which rational jurors could conclude beyond a reasonable doubt that the behavior of defendant's dog put officers in reasonable apprehension of an immediate battery. We further conclude that there is no evidence that the jury was actually exposed to any information regarding defendant's incarceration, and that the trial court did not misinform the jury, and its instructions to the jury adequately protected defendant's rights.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ David H. Sawyer
/s/ Jane M. Beckering